DECISION AND JUDGMENT ENTRY
Chester B. Martin appeals his conviction for theft, a violation of R.C. 2913.02. He argues that his conviction is supported by insufficient evidence. We disagree, because we find that the state presented evidence that, if believed, would convince the average mind of Martin's guilt beyond a reasonable doubt. He next argues that his conviction is against the manifest weight of the evidence. We disagree because we find, upon a thorough review of the record, that the jury did not clearly lose its way and create a manifest miscarriage of justice in resolving conflicts in the evidence. Martin finally argues that the trial court erred in overruling his motion to dismiss because the prosecution commenced after the applicable statute of limitations had run. We disagree because we find that the statute of limitations was tolled as to the R.C.2913.02(A)(1) and R.C. 2913.02(A)(2) violations until discovery of the theft and because we find that the state commenced prosecution within one year of discovery of the R.C. 2913.02(A)(3) violation. Accordingly, we affirm the judgment of the trial court.
 I.
On February 11, 1999, a grand jury indicted Martin for theft of fifty thousand dollars from The Plumbers and Pipefitters Local #168 Credit Union ("Credit Union") on or about April 30, 1991. The state accused Martin, the one-time treasurer and manager of the Credit Union, of cashing a check made out to the Marietta Savings Bank ("MSB") and drawn on Credit Union funds for personal use instead of buying a fifty thousand dollar certificate of deposit ("CD") as reflected in the general ledger and other financial reports of the Credit Union. The state asserted that the theft went undiscovered because someone forged several CD's over the years and maintained the Credit Union's financial records as if a fifty thousand dollar C.D. had been purchased with the check.
After pleading not guilty, Martin moved to dismiss the indictment on the grounds that the statute of limitations had run.
At the hearing on the motion to dismiss, David Rudischum, a Certified Public Accountant employed by American Share Insurance ("ASI"), testified that he began an audit of the Credit Union in July or August of 1997. ASI continued this audit in late November and the beginning of December of 1997. As a result of the audit, ASI suspected that the manager of the Credit Union, Marlene Moening, was embezzling money. ASI was unable to verify the Credit Union's investments in CD's because Martin did not turn over the records to the auditors when they requested them in July or August of 1997 and in November or December of 1997. In February 1998, Marlene Moening admitted a number of thefts from the Credit Union. By that time, ASI had begun to focus on the Credit Union's CD's in their on-going investigation of Moening.
ASI finally received copies of four CD's held by the Credit Union in the Marietta Savings Bank ("MSB"). They were not given the original CD's. An ASI employee was able to confirm over the telephone that three of the four CD's were legitimate. Rudischum then went to MSB with the four copies of the CD's. Rudischum testified that MSB employees were able to verify three of the CD's by producing records of interest payments to the Credit Union. They could not produce records of any interest being paid on the fourth C.D. ("the questionable CD"). The questionable C.D. was made out to the Credit Union in the amount of fifty thousand dollars.
In February 1998, MSB employees indicated to Rudischum that the C.D. was a fake document because: (1) there was no record of the account number that appeared on the CD; and (2) the authorized signature could not have been signed by the employee whose name appears because she left MSB at least a year before the C.D. was purportedly issued.
In March 1998, Rudischum learned from MSB that the Credit Union did not open an account with MSB until 1992. At this point, ASI began to investigate the questionable C.D. by going back through the financial records of the Credit Union and tying each C.D. recorded in the general ledger, noting when it was opened and tracing it to the 1099[2]
interest forms from MSB to verify the accuracy of the general ledger. ASI also looked for the checks issued to buy each CD. ASI found a check written in April 1991 for a C.D. that did not correspond to the purchase of a verifiable CD.
ASI verified that interest had never been paid on the questionable C.D. or the CD's that allegedly rolled-over into the questionable CD. ASI also examined the prior audits of the Credit Union. ASI employees discovered that the Credit Union had reported the questionable fifty thousand dollar C.D. to ASI during audits in 1993 and 1995. In their investigation, ASI found copies of the questionable CD's predecessors,i.e., CD's that purported to roll over into the questionable CD.[3]
However, the auditors did not verify the questionable CD's during prior audits.
ASI obtained a copy of the April 30, 1991 check from MSB because the Credit Union's original May 1991 bank statements, including the cancelled checks, were missing. The copy indicated that Chester Martin signed the check. ASI employees contacted MSB in an attempt to trace the proceeds of the check. MSB informed ASI that it could not disclose that information, but did disclose that the Credit Union did not have an account with MSB when the check was deposited there. ASI employees then contacted the Ohio Division of Financial Institutions and obtained a subpoena to obtain the information about the check proceeds. MSB's search of their records revealed that the check proceeds went into accounts in the name of Chester Martin or his wife, Susan Martin.
Rudischum also testified that Martin was the treasurer of the Credit Union from 1991 to 1998 and the manager of the Credit Union from 1991 until 1995.
Christine Law, the audit manager for ASI, testified at the hearing that she attempted to confirm the questionable C.D. with MSB, but MSB was unable to verify it. She explained that she and the other ASI employees did not immediately suspect that the C.D. was a forgery because there had been so many bookkeeping errors at the Credit Union. ASI employees did entertain the possibility that it was part of the embezzlement by Moening. She did not suspect Martin when she left the audit of the Credit Union in 1998.
Joyce Ritche, the Assistant Vice president and Human Resource Officer at MSB, also testified at the hearing. She verified that ASI had come to MSB with the four CD's and that only three CD's could be verified. She also verified a document that stated that MSB issued no 1099 interest forms for the Credit Union in 1991.
After the parties briefed the statute of limitations issue, the trial court decided that pursuant to R.C. 2901.13 ("the period of limitation shall not run during the time that the corpus delicti remains undiscovered") the indictment was timely. Accordingly, the trial court denied Martin's motion to dismiss.
The trial court held a jury trial. Edward Fisher testified that he is the president of the Credit Union, a member of the Union and the Credit Union, and on the Board of Directors of the Credit Union. He explained that it was the treasurer's responsibility to keep the Credit Union's CD's and that Martin, as treasurer of the Credit Union, was responsible for keeping the general ledger for the Credit Union. Rose Logston, the former office manager for the Credit Union, testified that she never had the Credit Union's CD's in her possession and never discussed Martin's personal account at the Credit Union with him.
Michael Gebbie, former Vice-President of Risk Management at ASI, testified that ASI began an in-depth audit of the Credit Union in February 1998 because the Credit Union had stopped sending its monthly financial statements. He explained that he and Rudischum eventually discovered that the Credit Union's records indicated that it had two hundred thousand dollars in CD's, but that they could only validate one hundred and fifty thousand dollars in CD's. He testified that Martin maintained the original CD's, i.e., Martin had custody of the C.D. records. He explained that, upon their request, they received photocopies of the CD's from the Credit Union. He and Rudischum took the photocopied CD's to MSB. According to Gebbie, the General Ledger prepared by Martin indicated that the Credit Union purchased a fifty thousand dollar C.D. on April 30, 1991 from MSB. Gebbie testified that MSB had no records of such a purchase. However, MSB received a fifty thousand dollar check from the Credit Union on that day. MSB also confirmed that one of the photocopied CD's provided by the Credit Union was never issued by MSB.
On cross-examination, Gebbie admitted that some of the Credit Union's records of Martin's personal account indicate that he withdrew fifty thousand dollars from his account on April 30, 1991. Gebbie noted that Martin had sole access to many of the Credit Union's records.
Dale Wagner testified that he is a member of the Plumbers and Pipefitters Local #168 union ("Union") and was on the Credit Union's Audit Committee. The Audit Committee completed Statements of Financial Condition each month based upon the information provided by the treasurer, i.e., Martin. According to Wagner, the Statement of Financial Condition ending March 31, 1991 indicated that the Credit Union had seventy five thousand dollars in CD's and the Statement of Financial Condition ending April 30, 1991 indicated that the Credit Union had one hundred twenty-five thousand dollars in CD's.
Cathy Moody, a MSB employee of ten years, testified that she informed ASI that the April 30, 1991 fifty thousand dollar check drawn on Credit Union funds was used to open a ten thousand dollar C.D. in Chester Martin or Susan Martin's name, payoff a loan in Chester Martin or Susan Martin's name and pay the associated fee to the county recorder, deposited into a checking account in Chester Martin or Susan Martin's name, and deposited into a savings account in Chester Martin or Susan Martin's name.[4]
Moody then testified as to the legitimacy of the questionable CD's. Three questionable CD's were all purportedly issued by MSB in the amount of fifty thousand dollars: (1) one issued on February 22, 1993 and maturing on February 22, 1995; (2) one issued on February 22, 1995 and maturing on February 22, 1997; and (3) one issued on February 22, 1997 and maturing on February 22, 1999. She testified that after she examined the questionable CD's, she concluded that they were forgeries because: (1) the questionable CD's bore an account number reserved for ninety-one day CD's while purporting to be twenty-four month CD's; (2) the distribution date of the questionable CD's did not coincide with the end of a fiscal quarter, which is normal MSB practice; (3) MSB doesn't refer to "twenty-four month" C.D. as the questionable C.D. purported to be, rather, it refers to such CD's as "two-year" CD's and (4) the penalty clause for the questionable C.D. was that for a seventy-seven month CD, rather than the term for a two-year CD.
Moody also explained that when a C.D. "rolls-over" as the questionable CD's purported to do, MSB does not issue a new certificate. However, the questionable CD's purport to roll-over without a new certificate. According to Moody the authorized signature on the questionable CD's purported to be that of Connie Hill. Because Hill was only employed with MSB until 1995, she could not have signed the C.D. that was purportedly issued in 1997.
Moody then identified a 1099 form from MSB for interest paid to the Credit Union in 1992. The 1099 lists an account with the number identical to the one appearing on two of the questionable CD's. Moody explained that she could tell from the 1099 that MSB closed this account in 1992, because the account number had a "c" to the left of the account number. Moody also identified the 1099 forms for 1992 to 1997. Moreover, she noted that MSB did not issue a 1099 to the Credit Union in 1991 and that the Credit Union first opened an account with MSB in 1992 according to MSB records. The 1099 forms from 1992 to 1997 fail to list the questionable CD's among the accounts held by the Credit Union and thus, listed no interest income from the questionable CD's.
MSB was unable to locate the original C.D. issued in 1992, which had the same account number as two of the questionable CD's, but Moody was able to locate other bank records that showed (1) that the account was opened on February 21, 1992 and was closed on May 22, 1992; and (2) a fifty thousand dollar seventy-seven month C.D. was opened on May 22, 1992.
Moody further testified that the only person named on Credit Union's accounts until 1997 was Chester Martin.
Marlene Moening testified that she was the office manager of the Credit Union from 1994 to 1998. She explained that she never had any decision-making authority over Credit Union investments. She testified that Martin kept the original CD's. Moening admitted that she stole money from individual accounts at Credit Union and had already been sentenced after being convicted for grand theft. She explained that she took cash that a person would deposit in their Credit Union account, but never post the deposit or post a lesser deposit in an attempt to hide the theft. She denied making a plea bargain with the prosecutor's office in exchange for her testimony.
Rudischum repeated much of his testimony from the hearing on the motion to dismiss. He also testified that he investigated the Credit Union's records to determine whether Martin had fifty thousand dollars in his personal account at the Credit Union between January 1991 and June 1991. He concluded that he did not. On cross-examination, Rudischum testified extensively about this conclusion. He admitted that he did not have a handwriting expert determine whether Martin wrote the entries in the Credit Union's general ledger concerning the April 30, 1991 check.
Rudischum also testified that in June 1998, he believed that there was fifty thousand dollars missing from the Credit Union's checking account in addition to the money stolen by Moening. He explained that the entries in the general ledger concerning the April 30, 1991 check would not have helped Moening cover up her thefts.
Walter Hawkins of the Ohio Division of Financial Institutions testified that he is a review examiner who evaluates field examinations of state chartered credit unions. Hawkins explained that the Division does not perform audits; rather, it performs examinations of a credit union for its safety and soundness. He noted that an audit goes into much more detail within each entity. He further explained that the Division does not do yearly exams; rather, it does them as often as possible. He also explained that it would be unusual for the Division to verify the existence of CD's if presented with proper paperwork.
Richard Meek, a sergeant in charge of the Detective Bureau of the Marietta Police Department, testified that he interviewed Martin in September 1998. According to Meek, once he confronted Martin with the evidence obtained from ASI, Martin stated "he had had a heart attack in 1997 and suffered some memory loss. He couldn't remember any of those transactions, [and] that it certainly looked like he had done what [Meek] suggested * * *, that was embezzled those funds."
Once the state rested, Martin moved for a Crim.R. 29 acquittal, which the trial court denied. Martin then testified. He denied stealing money from the credit union, forging the questionable CD's, or entering the information about the April 31, 1991 check in the general ledger. He denied faking his own Credit Union records, which show that the fifty thousand dollar check was debited from his personal account. Martin presented exhibits and testified that the monthly Statement of Financial Condition he prepared for the Audit Committee on June 30, 1991 did not include the questionable C.D. in its total Credit Union assets. Martin also presented receipts that indicated that the balance of his Credit Union account in 1991 was over fifty thousand dollars. He denied removing the Credit Union's original cancelled checks for May 1991, which were missing. Martin also testified that the Credit Union's computer system was not reliable until 1993.
Through cross-examination, the state questioned the validity and authenticity of many of the documents supporting Martin's claim that he had over fifty thousand dollars in his Credit Union account at the time the April 30, 1991 check was cashed. The state asserted that at least one of the documents Martin used was different than the original. The state questioned Martin about documents from People's Bank that indicated that Martin did not make the deposits into his Credit Union account that he claimed he made.
Thomas Decker, a member of the Union, did business with the Credit Union as an individual and on behalf of the Union. He testified that none of the money he deposited was ever missing and that he trusted Martin with his money. James Denton, also a Union member, testified that whenever he gave Martin cash to deposit in his account, he did. He explained that he trusted Martin with his money.
Mary Lou Rauch, the office manager of the Union, testified that Martin came to the Union offices after he was indicted to look for Credit Union records that may have been left at the Union. She testified that he found the General Ledger there and could not have smuggled it in with him.
Judge Ed Lane testified that he knew Martin and believed him to be an honest, trustworthy, and truthful person. He further testified that Martin had a reputation for honesty and trustworthiness.
At the close of Martin's case, he renewed his Crim.R. 29 motion for acquittal, which the trial court denied.
On rebuttal, the state presented the testimony of Tonya Fournier and Curt Robson. Fournier, an employee of People's Bank, authenticated records that disputed Martin's testimony that he had deposited enough money to bring his Credit Union account balance to above fifty thousand dollars prior to April 30, 1991.
Robson, the Chief Financial Officer of ASI, testified that he is a CPA and that during the trial he had been tracing the deposits Martin claimed that he made to his Credit Union account prior to April 30, 1991. He testified that he looked for supporting documents. He explained in detail that many of the documents Martin presented did not correspond to Credit Union records that had been in possession of the state or ASI. He also opined that one of the documents that Martin alleged to be an original deposit slip was actually a photocopy on one side. He explained that he could "tie" several of Martin's smaller deposits to Credit Union records, but was unable to "tie" a $10,468.39 deposit or a $4970.13 deposit. He also testified that the Statements of Financial Condition presented by the state and authenticated by Dale Wagner corresponded with records kept by ASI; however those presented by Martin did not so correspond.
The jury found Martin guilty and the trial court sentenced him accordingly. Martin appealed and assigned the following errors:
 I. The evidence was insuffiencent to find Appellant guilty and thus, Appellant is entitled to a judgment of acquittal as to count four (sic) pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.
 II. Appellant's conviction is against the manifest weight of the evidence.
 III. Appellant was denied his right to Due Process of Law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Ohio Constitution, and [R.C.] 2901.13, when he was convicted of the theft, an offense for which the Statute of Limitations on criminal prosecution had run.
 II.
In his first assignment of error, Martin argues that there was insufficient evidence to support his conviction. He focuses on whether the state proved that Martin did not have fifty thousand dollars in his personal account to cover the April 30, 1991 check. He also asserts that Moening's involvement in ASI's discovery of the questionable CD's "casts doubt on whether [Martin] committed a theft."
When we review the sufficiency of the evidence, we must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v. Virginia (1979),443 U.S. 307. Circumstantial evidence and direct evidence inherently possess the same probative value, even with respect to essential elements of an offense. See State v. Jenks (1991), 61 Ohio St.3d 259, 263-264. The trier of fact is free to believe all, part, or none of a witness' testimony. State v. Nichols (1993), 85 Ohio App.3d 65, 76.
The grand jury indicted Martin for theft in violation of R.C. 2913.02. R.C. 2913.02 provides:
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 (1) Without the consent of the owner or person authorized to give consent;
 (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
(3) By deception.
The state presented evidence that (1) someone entered the April 30, 1991 purchase of a fifty thousand dollar C.D. into the General Ledger, but no such C.D. was ever purchased; (2) Martin was the person responsible for keeping the General Ledger; (3) several questionable CD's were created by someone; (4) Martin had the responsibility to invest the Credit Union's money; (5) Statements of Financial Condition prepared by Martin included the questionable CD's; (6) the check that the General Ledger indicated was used to purchase a fifty thousand dollar C.D. on April 30, 1991 was actually cashed by Martin and used for his and his wife's benefit; and (7) that Martin did not have fifty thousand dollars in his personal Credit Union account from January 1991 to June 1991. This evidence, if believed, is enough to convince a reasonable trier of fact that Martin knowingly exerted control over the property of the Credit Union either without consent of the Credit Union or beyond the scope of the consent given to him in his official capacity or by deception. Thus, we find that there is sufficient evidence supporting Martin's conviction. Accordingly, we overrule his first assignment of error.
 III.
In his second assignment of error, Martin argues that his conviction is against the manifest weight of the evidence. He relies upon his arguments advanced in his first assignment of error.
In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. In making such a determination, we sit as a thirteenth juror. Thompkins at 387, citingTibbs v. Florida (1982), 457 U.S. 31, 42. However, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."Thompkins at 387, quoting Martin at 172.
After thoroughly reviewing the record, including the transcripts and exhibits, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in resolving conflicts in the evidence. Here, the jury had two competing theories concerning the account from which the April 30, 1991 check was drawn. The state presented testimony and exhibits that indicated that the check represented Credit Union money, while Martin argued that he had enough money in his account for the check to have represented his personal funds. Given (1) the evidence that someone attempted to create documents indicating that the check was used to purchase a C.D. for the Credit Union and that Martin had custody of such records and relied upon them in creating Statements of Financial Condition; and (2) the testimony of Robson disputing the authenticity of documents supporting Martin's theory, we cannot find that the jury lost its way or created a manifest miscarriage of justice in determining which theory to believe. Accordingly, we overrule Martin's second assignment of error.
 IV.
In his third assignment of error, Martin asserts that the statute of limitations had run before the state indicted him. He first argues that the trial court erred in applying R.C. 2901.13(F) because it does not apply. He then argues that because the offense with which he was charged contains an element of fraud, the tolling provision of R.C. 2901.13(F) does not apply.
 A.
We first consider Martin's argument that R.C. 2901.13(F) does not apply. R.C. 2901.13 sets forth the statute of limitations for criminal offenses. It provides:
 (A)(1) Except as provided in division (A)(2) or (3) of this section or as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:
(a) For a felony, six years:
* * *
 (B) If the period of limitation provided in division (A)(1) or (3) of this section has expired, prosecution shall be commenced for an offense of which an element is fraud or breach of fiduciary duty, within one year after discovery of the offense either by an aggrieved person, or by the aggrieved person's legal representative who is not a party to the offense.
* * *
 (F) The period of limitations shall not run during any time when the corpus delicti remains undiscovered.
* * *
"Thus, the plain wording of the statute requires that felony prosecutions (other than aggravated murder or murder) must be brought within six years from the date the offense is committed."[5] State v. Hensley (1991),59 Ohio St.3d 136, 137. As noted by the Hensley Court,
 the use of the phrase `[e]xcept as otherwise provided in this section' by the General Assembly has afforded the state certain statutory exceptions to the absolute bar, and has done so in the form of specialized rules and tolling provisions. Indeed the legislature has enumerated these rules and tolling exceptions in the succeeding paragraphs of R.C. 2901.13.
Hensley at 137.
In analyzing the applicability of R.C. 2901.13(F), the Hensley Court noted that "[t]his provision clearly tolls the running of the statute of limitations." In Hensley, the defendant, accused of sex offenses against a minor, argued that the prosecution was barred by the six year statute of limitations and that R.C. 2901.13(F) did not apply because the corpus delicti of the crime was discovered when the children knew that what had been done to them was wrong, i.e., the criminal nature of the acts. The state argued that the six-year statute of limitations was tolled until a "prosecutor or other law enforcement agencies discover the corpus delicti of the crime." The Hensley Court rejected this argument, noting that "[s]uch a rule of law could subject a person to criminal liability indefinitely with virtually no time limit, and thus frustrate the legislative intent of a statue of limitations on criminal prosecutions."Hensley at 139. The Court turned to R.C. 2151.421 for a list of "responsible persons," who upon obtaining knowledge of possible abuse of a child must report the abuse to proper authorities, and determined that once a "responsible person" knows of the corpus delicti of the crime, the crime is discovered for purposes of R.C. 2901.13(F).
Thus, in Hensley, the Ohio Supreme Court relied upon R.C. 2901.13(F)'s tolling provision. However, in State v. Climaco (1999), 85 Ohio St.3d 582, the Ohio Supreme Court rejected the argument that R.C. 2901.13(F) tolls the statute of limitations until the corpus delicti of the crime is discovered when the crime is discovered within the ordinary statutory period. Climaco at 588. The court specifically declined to apply R.C.2901.13(F) to alleged offenses that were discovered within the statute of limitations that began to run when the offenses were committed. The court reasoned that, because the plain language of R.C. 2901.13(F) tolls the statute of limitations until discovery (that is, the statute of limitations should not begin to run until discovery), the crime could not be "discovered" during the limitations period.
While the plain language of R.C. 2901.13(F) that the statute of limitation "shall not run during any time when the corpus delicti remains undiscovered" seems to support the state's position that the R.C.2901.13(A)(1)(a) limitation of six years for a felony did not start to run until the act and the criminal nature of the act of theft was discovered, the Ohio Supreme Court rejected such a contention inClimaco, but did not explain when R.C. 2901.13(F) would apply. It did, however, note that "[h]ere, we do not need to resort to subsection (F) because the alleged offenses were discovered within the statute of limitation of R.C. 2901.13(A)(2), [the two year statute of limitations for misdemeanor offenses.])" We conclude from this final sentence that R.C. 2901.13(F) may apply here because the offense was not discovered until after the six-year statute of limitations (as measured from the date of the offense, April 30, 1991) had expired. Thus, we distinguishClimaco and rely upon Hensley and the language of the statute itself. Accordingly, we reject Martin's argument that we may not rely upon R.C.2901.13(F).
 B.
Martin next argues that the trial court erred in using 2901.13(F) instead of the more specific 2901.13(B) because R.C. 2913.02 contains an element of fraud. He implicitly asserts that the more specific provision of R.C. 2901.13(B) would prevent R.C. 2901.13(F)'s tolling provision because it is inconsistent with the general provision tolling the statute of limitations until discovery (R.C. 2901.13(F)) and is not cumulative. See R.C. 1.12 (special provision governs unless cumulative). See, alsoState v. Stephens (July 25, 1997) Clark App. No. 96CA0117, unreported, citing State v. Mitchell (1992), 78 Ohio App.3d 613. However, we find that the two provisions are not necessarily inconsistent. R.C. 2901.13(F) tolls the statute of limitations until anyone discovers the corpus delicti, while R.C. 2901.13(B) tolls the statute of limitations until the party aggrieved by the fraud discovers the corpus delicti. Thus, R.C. 1.12
does not apply because the two provisions are not inconsistent. However, in addressing Martin's argument, we assume that R.C. 2901.13(B) applies here.
R.C. 2901.13(B) applies to "an offense of which an element is fraud orbreach of fiduciary duty * * *." R.C. 2901.13(B). Thus, to determine whether R.C. 2901.13(B) applies here, we focus on the elements of the offenses with which Martin was charged, i.e., R.C. 2913.02(A)(1)-(3).
R.C. 2913.02(A)(3) prohibits theft "by deception."
 "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.
R.C. 2913.01(A). "Defraud means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(B). Stephens, Clark.
Thus, R.C. 2901.13(B) applies to the charge of theft by deception. However, the trial court's error in failing to apply R.C. 2913.01(B) is harmless if by applying R.C. 2913.01(B), the state timely commenced prosecution of Martin.
Key to our analysis is the date the corpus delicti was discovered. The state did not charge Martin with forgery of the CD's; therefore, the date of discovery is not the date ASI discovered the questionable CD's. Here, the theft occurred when Martin used the April 30, 1991 check for personal purposes instead of buying a C.D. as he documented in the general ledger and other Credit Union Records. Thus, once ASI learned that the check had been used for something other than the purchase of a C.D. for the Credit Union, it discovered the corpus delicti (the act and the criminal nature of the act). ASI discovered the check in January or February 1998, but the Credit Union records indicated that the check was used to purchase a C.D. for the Credit Union. In April 1998, ASI learned that the check was not used for Credit Union business because MSB refused to produce records tracing the proceeds of the check because it did not concern Credit Union business. Thus, in April 1998, ASI knew that the check was not used to purchase a C.D. as the general ledger indicated and "discovered" the criminal nature of the act.
ASI's discovery in April 1998 was well after the six-year statute of limitations period would have run. Since the crime was discovered out of the original statute of limitations period, the state had a year to prosecute it from the date of discovery, April 1998. R.C. 2913.01(B). The state indicted Martin in February 1999, well within the one-year period. Thus, Martin's prosecution for violating R.C. 2913.02(A)(3) is not barred by R.C. 2913.01(B).
 C.
Because we find that the state's prosecution of Martin for theft was not barred by the statute of limitations, we overrule Martin's third assignment of error.
 V.
In sum, we overrule all of Martin's assignments of error and affirm the judgment of the trial court.
[2] A 1099 is a form prepared by financial institutions for both its customers and the Internal Revenue Service. This form shows the interest earned by a customer during the year.
[3] There were a total of 3 fake fifty thousand dollar CD's. As each C.D. matured it was purportedly rolled over into a new forged CD. We use the term "questionable CD" to refer to the three certificates.
[4] The parties later stipulated that the proceeds of the April 30, 1991 check went into these accounts and MSB has the records to verify this.
[5] This statute has been amended to lengthen the statute of limitations period for some felonies. These amendments do not affectHensley's analysis of the remainder of the statute.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. The stay as herein continued will terminate in any event at the expiration of the sixty day period.
The stay shall terminate earlier if the appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J. Evans, J.: Concur in Judgment and Opinion as to Assignments of Error I II; Concur in Judgment Only as to Assignment of Error III.